UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Karen Sosby,

       Plaintiff,

       v.                           Case No. 1:02cv837

Miller Brewing Co.,                   Judge Michael H. Watson

       Defendant.

---

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 31) Plaintiff has filed a Memorandum in Opposition. (Doc. 38) Defendant has filed a Reply. (Doc. 41) This matter is now ripe for review.

## I.   FACTUAL BACKGROUND

Plaintiff was last employed by Defendant in their Trenton, Ohio brewery as a forklift driver. (Sosby Depo. at 80) On May 14, 1998, Plaintiff suffered a back injury on the job. (Id. at 91-92). Plaintiff was treated in the emergency room where she reported that she had problems with her back in the past, and was being treated by Dr. Gula, her orthopaedic physician. (Sosby Depo. Ex. 9). Plaintiff did not immediately miss any work due to the injury. (Id. at 92) However, Plaintiff continued to suffer back pain, and on July 8, 1999 Dr. Gula required that she take off from work until further notice. (Sosby Depo, Ex. 10; Sosby Depo. at 93) Shari Moler, Defendant's workers' compensation manager, FMLA manager, and transitional work manager, contacted Plaintiff to attempt to persuade her to get a second opinion from a company-paid physician to determine the extent of her injuries. (Moler Depo. at 18; Moler Depo., Ex. 1) Plaintiff initially refused to see a company-paid physician, but later changed her mind. (Id., Ex. 1) On August 23, 1999, Plaintiff saw Dr. Staley, who concluded that Plaintiff could return to work without any restrictions. (Id.)

After receiving Dr. Staley's report, Moler contacted Dr. Gula four times in an attempt to find out if Plaintiff could return to work with restrictions to her regular job duties  (Id.)  Dr. Gula released Plaintiff to return to work on November 1,1999 with restrictions on lifting, bending and squatting.  (Id.)  These restrictions were approved by her team for thirty days.  (Id.)

Upon returning to work, Plaintiff met with her team before she began working her shift. (Sosby Depo. at 96)[1] Plaintiff testified in her deposition that although she was aware that she had work restrictions, she was unaware of what the actual restrictions were.  (Id. at 106-107)  Plaintiff states that she was instructed by Don Belfort, her team manager, to perform her regular job duties, which she proceeded to do without complaint.  (Id.)  After a couple of hours, Plaintiff developed pain in her foot.  (Id. at 97).[2]  In an Accident/Incident Report, Plaintiff stated that the injury to her foot occurred while she was walking from the team room to the glass warehouse.  (Sosby Depo. Ex. 13)  However, in her deposition, Plaintiff testified that the pain in her foot had been present since the 1998 back injury and was aggravated when she was climbing on and off of her forklift on November 1, 1999. (Sosby Depo. at 119)[3]  Plaintiff explained that she told Rick Wilson, the Material Services Department Manager, that her back was hurting and she was having a hard time walking. (Id. at 121)[4]  Plaintiff testified that she then complained to Moler that she had back pain and trouble walking because Defendant had requested that her doctor release her to work

---

[1]  Plaintiff's Memorandum in Opposition incorrectly lists these dates as having occurred in 2000 instead of 1999.

[2]  Plaintiff reports on Company's Accident and Sickness Claim form that the accident occurred on November 2, 1999, but later testified in her deposition that the accident took place on the first day that she returned to work, November 1, 1999.  (Sosby Depo., Ex. 12; Id. at 99)

[3]  Plaintiff did not indicate in any of the accident reports that the injury occurred while climbing on or off of her forklift.  (Sosby Depo. at 120)

[4]  Wilson emailed Moler that he had "no recollection whatsoever of having a conversation with Karen Sosby regarding her having foot pain."  (Moler Depo. at 57-58; Id., Ex. 1)

2

again before she was ready.  (Id. at 121)  Moler informed Plaintiff that it was Dr. Gula and not Defendant who had released her to return to work.  (Id. at 118, 121)

Plaintiff continued to work the rest of her shift on November 1st and also reported for work as scheduled on November 2nd.  (Id. at 121-22)  Shortly thereafter, Plaintiff went to the hospital for treatment of her foot injury.  (Id. at 122-23)  On November 8, 1999, Dr. Gula saw Plaintiff for her foot injury and restricted her from work until further notice.  (Id. at 124; Sosby Depo. Ex. 14).  Dr. Gula released Plaintiff to return to work without any restrictions on January 3, 2000.  (Id., Ex. 14)

In February of 2000, Plaintiff claims she re-injured her left foot while working, but did not complete any workers' compensation or short-term disability paperwork because she did not want to miss any work.  (Sosby Depo. at 133)  Defendant provided Plaintiff with a special parking pass to reduce the distance that she would have to walk in order to accommodate her injury.  (Id.)

Also in February of 2000, Plaintiff and Moler discussed the company's position that Plaintiff's November 1999 injury was not work-related because Plaintiff had listed on the injury report that the injury occurred when she was walking in the plant.  (Id. at 138)  Moler gave Plaintiff examples of injuries which would be work-related, such as one which occurs while climbing on or off of a forklift.  (Moler Depo., Ex. 1; Sosby Depo. at 136)  Plaintiff denies that Moler specifically mentioned such an injury.  (Sosby Depo. at 136)

On March 3, 2000, Plaintiff suffered a foot sprain while she was getting down off of her forklift.  (Id. at 140, 145-47)  Plaintiff reported to co-workers that she experienced immediate pain and swelling that was much worse than previous injuries.  (Id. at 148)  X-rays taken in the emergency room revealed no fracture, and Plaintiff's foot did not show any heat, redness, or swelling.  (Id. at 155; Ex. 20).  The emergency room physician released Plaintiff to return to work with light duty restrictions and recommended that she follow up with Dr. Gula.  (Id.)  Plaintiff did not return to work and did not return Moler's

3

phone calls inquiring about her status. (Sosby Depo. at 157; Moler Depo. Ex. 1 at 12) On March 10th, Moler reached Plaintiff by phone and asked her to undergo an evaluation by the company physician, but Plaintiff did not do so. (Sosby Depo. at 161-63; Moler Depo. at 94-95)

Moler was suspicious of Plaintiff's latest injuries for various reasons, including the emergency room records which contradicted Plaintiff's claim of swelling in her foot, and the fact that Plaintiff's leave coincided with vacations of her husband and her sister, who were also employed by Defendant. (Moler Depo at 84, 64-65, 87) Moler ordered surveillance of Plaintiff's home between March 10 and 14, 2000. (Moler Depo. at 88; Sosby Depo. Ex. 5) The surveillance showed that Plaintiff was not at home. (Moler Depo. at 88) On March 22, 2000, Moler rejected Plaintiff's workers' compensation claim for the March 3, 2000 injury because she felt that the claim was manufactured. (Id. at 106) Moler explained that test results from the hospital were contradictory to the symptoms that Plaintiff reported. (Id.; Ex. 1, at 10)

On March 29, 2000, Plaintiff filed a discrimination claim with the OCRC, alleging that Defendant denied her worker's compensation claim because of her race, sex, and disability; and Defendant forced her to do work in violation of her doctor's restrictions. (Sosby Depo. Ex. 25)

On April 6, 2000, Plaintiff underwent an independent medical examination by Dr. David Randolph at Defendant's request. (Moler Depo. at 114-18) Dr. Randolph concluded that Plaintiff's claimed injuries and her medical treatment were inconsistent with her description of the March 3, 2000 accident. (Id. at 120-21)

Moler testified that Plaintiff's refusal to see a company physician and Dr. Randolph's report further raised suspicions that Plaintiff's workers' compensation claim may have been fraudulent. (Id. at 124) Moler ordered another round of surveillance of Plaintiff's home that began on May 6, 2000. (Id. at 130) During the surveillance, Plaintiff was seen working in

4

her yard for over three hours.  (Doc. 31, Ex. 3)  Plaintiff was observed carrying flats of flowers, carrying yard tools from the garage to the front yard, bending at the waist planting flowers and picking weeds for several minutes at a time without standing up, watering her garden while standing and walking, and working on her hands and knees for several minutes at a time.  (Id.)

On May 19, 2000, Dr. Gula extended Plaintiff's medical leave to June 5, 2000. (Sosby Depo., Ex. 5)  Dr. Gula stated that Plaintiff was unable to perform any and all job duties.  (Id.)

On May 22, 2000, Plaintiff wrote a letter to the OCRC to withdraw her complaint against Defendant, stating that she was unable to obtain legal representation and received legal counsel that the statute of limitations had run.  (Id., Ex. 29)  On June 5, 2000, Plaintiff returned to work with no restrictions.  (Id., Ex. 5; Id. at 160)  Plaintiff's discrimination charge was officially withdrawn with the OCRC on July 12, 2000.  (Id., Ex. 31)

A workers' compensation hearing was held on August 8, 2000 for Plaintiff's March 3, 2000 injury.  (Id., Ex. 21)   Plaintiff was only aware of the March surveillance, and only learned of the May surveillance during the hearing.  (Id. at 168-69; Id., Ex. 24)  When questioned during the hearing, Plaintiff testified that she was "completely in bed" and did not do any yard work between the time of her injury in March 2000 and her return to work on June 5, 2000. (Id., Ex. 21)[5]

On August 25, 2000, Steve Mellott, the Human Resources Manager at the Trenton brewery, advised the union that Defendant intended to terminate Plaintiff upon her conviction for workers' compensation fraud.  (Moler Depo., Ex. 1) However, Mellott learned soon thereafter that the State of Ohio was unlikely to fully prosecute Plaintiff for workers'

---

[5]  The question that Ms. Sosby was asked in the hearing did not reference any surveillance, but specifically asked whether or not Plaintiff had done any yard work between March and June 2005, to which Plaintiff replied, "No.  No." (Sosby Depo., Ex. 21)  Plaintiff was then asked: "So between the time of your injury in March and June 5 of 2000, you didn't do any yard work?" (Id.) Plaintiff replied, "That's right." (Id.)

compensation fraud; and even if it did, prosecution would be a prolonged process and conviction was not guaranteed. (Id. at 18-19, 32-33). Because of the uncertainty of whether the matter would be prosecuted, Mellott instructed Thomas Mobley, Employee Relations Manager for Defendant, to begin an internal investigation. (Id.) The investigation was meant to give Plaintiff an opportunity to explain her testimony at the August 8, 2000 hearing. (Id.)

On August 31, 2000, Mobley met with Plaintiff, Dave Harris, the Material Services Department Manager, and Phil Ward, a union representative, to discuss possible disciplinary action and to give Plaintiff the opportunity to explain. (Sosby Depo. at 175-77; Id., Ex. 24) Plaintiff declined to give any comment when she was confronted with the surveillance video and asked that her workers' compensation attorney be present. (Id. at 179, Id., Ex. 24) On the same day, Mellott was informed by the Department of Labor that Plaintiff had filed a FMLA complaint on August 9, 2000. (Moller Depo., Ex. 1 at 1; Id. at 30-31)

On September 13, 2000, the parties to the August 31 meeting reconvened, along with additional representatives from both sides. (Id. Ex. 1; Sosby Depo. at 177-79). In this meeting, Plaintiff was shown a portion of the surveillance video and asked to explain the discrepancy between her testimony in the workers' compensation hearing and the conduct recorded on the video. (Sosby Depo. at 177-181) Plaintiff again gave no explanation. (Id. at 180)[6]

In September of 2000, Plaintiff made verbal complaints about the safety of the "dump room." (Doc. 41, Ex. F, Janis Skraucevs Decl.) Plaintiff had made similar verbal complaints in 1995 or 1996 and 1998. (Sosby Depo. at 525-40). The dump room is an area where defective cans and bottles of beer are crushed, causing the beer to be

---

[6] Plaintiff testified in her deposition that she was instructed by her attorney and the union not to give an explanation to Defendant. (Sosby Depo. at 180-81)

discharged from the defective containers, sometimes spilling on the floor. (Skraucevs Decl. ¶ 2). Plaintiff was one of several members of the material services team who complained about the dump room floor. (Skraucevs Decl. ¶¶ 2-3) However, the record indicates that Defendant's management responded positively to Plaintiff's complaints about unsafe working conditions, and promptly assigned a daily cleaning crew to the area and reinstalled a chlorine system to more efficiently clean the floor. (Id. ¶¶ 4-5)

On October 5, 2000, the parties attended a mediation with the OCRC concerning Plaintiff's FMLA retaliation charge. (Id. at 214) Defendant proposed to the mediator that Plaintiff voluntarily resign her position in exchange for Defendant's agreement to not contest her unemployment or COBRA eligibility; and to not seek restitution for Accident and Sickness benefits. (Mellott Depo. at 47)[7] Before and during the mediation, Mellott told the mediator that Plaintiff "was going to be leaving the organization one way or the other, and that any settlement could not include her staying with the company." (Id. at 46) During the mediation, Plaintiff became aware that Defendant intended to terminate her employment if she did not resign. (Sosby Depo. at 219-223) Plaintiff refused to resign and the mediation was adjourned by the mediator. (Id. at 221; Id., Ex. 5)

On October 9, 2000, Defendant notified Plaintiff that her employment was terminated. (Id., Ex. 35, Ex 5)

Defendant alleges that during discovery, Defendant learned that Plaintiff provided false information on her employment application. Defendant's employment application requires applicants to describe their employment history in detail, including their reason for leaving. (Id., Ex 7) The application warns that the information provided by the applicant is "subject to verification and **falsification of information** may result in disqualification or termination of employment, if you are hired." (Id.) (emphasis in original). The application

---

[7] Plaintiff had received $7721.31 in Accident and Sickness benefits while she was out of work between July 1999 and June 2000.

7

also requires applicants to certify that they "understand that any misstatement or omission of information may constitute grounds for immediate dismissal or rejection of my application." (Id.)

Plaintiff listed American Matsushita Corporation–Panasonic ("Panasonic") as her most recent employer and stated that she left Panasonic "to seek better employment." (Id., Ex. 7)[8] However, during her deposition, Plaintiff testified that she was involuntarily terminated from Panasonic. (Id. at 34-37) Plaintiff explained that the reason given for her termination was not being present in her work area. (Id. at 37) However, Plaintiff filed a charge with the OCRC, claiming that race discrimination played a part in her termination. (Id.) The OCRC mediated the dispute and Panasonic offered to reinstate Plaintiff. (Id. at 38-39) Plaintiff explains since she was offered reinstatement, she had not truly been fired. (Id., Ex. 27)

In her Complaint, Plaintiff claims (1) retaliatory discharge in violation of Ohio Revised Code § 4112.02(I); (2) violation of public policy embodied in § 4112.02(I); (3) violation of public policy embodied in Ohio common law favoring workplace safety; and (4) violation of the Family Medical Leave Act, 29 U.S.C. §§ 2615(a) and 2614.[9]

## II.  ARGUMENTS OF THE PARTIES

Defendant argues that Plaintiff cannot make out a *prima facie* case for retaliation because she cannot prove a causal connection between her termination and the OCRC charges and mediation. Defendant argues that the decision to terminate Plaintiff was made five months after her first charge and before Defendant knew about her second

---

[8]  Plaintiff Sosby testified in her deposition that she was employed by Panasonic for approximately five years from 1986 to 1991 (Sosby Depo. at 33); however, on her employment application with Defendant Miller Brewing Co., she stated that she was only employed by Panasonic for 27 months from March 1989 to June 1991 and that she was employed by Motorolla and NCR during the same time frame. (Sosby Depo. Ex. 7)

[9]  Plaintiff originally brought additional claims based on race, sex and disability discrimination. (Pl. Compl. ¶¶ 5-13, ¶¶ 21-33). However, Plaintiff has voluntarily withdrawn those claims. (Doc. 38 at 24, 34)

charge. Defendant argues that even if Plaintiff establishes a *prima facie* case of retaliation, Defendant terminated Plaintiff for a legitimate non-discriminatory reason: committing workers' compensation fraud. Defendant argues that Plaintiff cannot show that Defendant's stated reason is pretext for illegal retaliation.

Defendant argues that Plaintiff's public policy claim cannot succeed because this Court has recently held that wrongful discharge public policy claims based on § 4112.02(I) are not viable.

Defendant argues that the gap of time of at least two years between Plaintiff's complaints about workplace safety issues and her termination undermines any causal connection between these complaints and her termination. Furthermore, Defendant argues that Defendant addressed Plaintiff's complaints in conformance with Ohio's public policy that unsafe working conditions be corrected.

Defendant argues that Plaintiff has brought an entitlement claim under FMLA, and the claim is barred by the statute of limitations. Defendant argues that Plaintiff has injected an FMLA retaliation claim in her Memorandum in Opposition to Defendant's Motion in an attempt to avoid the statute of limitations problem. Defendant argues that even if Plaintiff had properly pled a retaliation claim, her claim would fail because the decision to terminate her was made prior to receiving any information that a FMLA claim had been filed.

Finally, Defendant argues that even if Plaintiff's claims survive summary judgment, the after-acquired evidence that Plaintiff falsified her employment application would have led Defendant not to hire or to terminate her.

In response, Plaintiff argues that because her termination occurred soon after Defendant learned of her second charge, there is an inference of causation. Plaintiff also argues that there are numerous reasons why Defendant's stated reason for her termination is pretextual.

Regarding her public policy claim based on Ohio Rev. Code § 4112.02(I), Plaintiff suggests that the court adopt the reasoning contained in *Mercurio v. Honeywell*, 2003 U.S. Dist. LEXIS 9521 (S.D. Ohio 2003). There, this Court held that deficiencies in the ADEA's remedial provisions leave the door open for a plaintiff to assert a public policy claim for wrongful discharge under Ohio law.

Plaintiff argues that genuine issues of material fact exist as to whether her employment was terminated in violation of Ohio public policy regarding workplace safety. Plaintiff argues that complaints about workplace safety occurred anywhere from 19 to 11 days before her termination, and that both Mellott and Mobley, who participated in her termination, were aware of these complaints.

Plaintiff argues that the statute of limitations does not bar her claim for FMLA retaliation. Plaintiff argues that the general statute of limitations for claims under the FMLA is two years after the date of the last event constituting the alleged violation. Plaintiff argues that while she made her last complaint regarding FMLA leave in August 2000, her rights under FMLA were not violated until she was terminated on October 9, 2000. Plaintiff argues that since the complaint was filed on October 9, 2002, the filing was within the limitations period.

Finally, Plaintiff argues that Defendant's argument that Plaintiff falsified her employment application is without merit, and Defendant's failure to raise after acquired evidence as an affirmative defense in the answer constitutes a waiver.

## III. ANALYSIS

### A. <u>Summary Judgment Standard.</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Determination that a fact is genuine can only occur when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* The initial burden of showing the absence of a genuine issue of material fact rests with the moving party, and once that burden is met, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In so doing, the nonmoving party may not rest on the mere allegations in the pleadings. *Id.* at 324.

The trial judge's function is not to weigh the evidence and determine the truth of the matter; however, the proper inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 249-250. When considering a motion for summary judgment, a court must examine the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *U.S. v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985). However, the trial court does not have a duty to search the entire record to establish that there is no material issue of fact. *See Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80 (6th Cir. 1985).

## B.   Retaliation under Ohio Rev.Code § 4112.02(I).

Plaintiff alleges that she was terminated in retaliation for the filing of her two OCRC charges. Under Ohio law, it is an unlawful discriminatory practice for:

> any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A). Ohio law also prohibits retaliation by an employer against an employee who "has made a charge, testified, assisted, or participated in any manner

11

in any investigation, proceeding, or hearing" related to the opposition of unlawful discriminatory practices defined in the statute.  Ohio Rev. Code § 4112.02(I).

Retaliation claims are analyzed in accordance with the burden-shifting analysis espoused in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 343 (6th Cir. 1998); *see also Plumbers & Steamfitters Commt. v. Ohio Civil Rights. Comm.*, 421 N.E.2d 128 (Ohio 1981) (noting that federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, is applicable to cases involving alleged violations of Ohio Revised Code Chapter 4112).

In order to establish a *prima facie* case of retaliation under Section 4112.02(I), a plaintiff must show that (1) he or she engaged in protected activity; (2) the employer knew of his participation in the protected activity; (3) he was the subject of adverse employment action; and (4) that a causal link existed between the protected activity and the adverse action. *Chandler v. Empire Chemicals, Inc.*, 650 N.E.2d 950, 954 (1994), *citing*, *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984).

The arguments of the parties center around the fourth prong of the *prima facie* case. Plaintiff argues that because her termination occurred soon after Defendant learned of her second charge, there is an inference of causation.  However, the mere fact that adverse employment actions occurred after the plaintiff engaged in protected activity is insufficient to support an inference of retaliation.  *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986).  Close temporal proximity, without more is insufficient to support an inference of retaliation.  *Id.* at 1272 (holding that discharge four months after filing a discrimination claim was insufficient to support an interference of retaliation); *see also Brown v. ASD Computing Ctr.*, 519 F.Supp. 1096, 1116 (S.D.Ohio 1981), *aff'd sub nom. Brown v. Mark*, 709 F.2d 1499 (6th Cir.1983) (three-month separation between protected

activity and termination did not raise the inference necessary to support a *prima facie* case of retaliation).

Plaintiff filed her first charge with the OCRC on March 29, 2000, and her second charge on August 9, 2000.  Plaintiff was terminated on October 9, 2000.[10]  Therefore, a period of approximately two months separated the protected activity and Plaintiff's termination.  While this period of time may constitute "close temporal proximity," Plaintiff has not alleged any additional evidence which would raise the inference of a causal connection.  The Court is hesitant to base a finding of a causal connection solely on temporal proximity.  *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000).  However, even if the Court were to determine that Plaintiff has established a *prima facie* case of retaliation under Ohio Revised Code § 4112.02(I), the Court finds that Plaintiff's claim fails for other reasons.

If the plaintiff proves a *prima facie* case of discrimination, the burden shifts to the defendant to produce "some legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 253 (quoting McDonnell Douglas, 411 U.S. at 802). If the defendant is able to establish a nondiscriminatory reason for the adverse action, the burden shifts back to the plaintiff to produce credible evidence that the reason offered by the defendant is a mere pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 804.

Defendant has explained that its reason for terminating Plaintiff was for lying while testifying under oath at her workers' compensation hearing.  Plaintiff can show that this

---

[10]  Plaintiff also argues that the second round of surveillance was ordered in retaliation for having filed a discrimination charge with the OCRC.  Plaintiff claims that Moler read a letter, which Plaintiff had faxed to her personal physician that referenced that she had filed a discrimination charge with the OCRC against Defendant.  Plaintiff claims that Moler received the letter on May 1, 2000.  Even if this second round of surveillance were to be considered as an adverse employment action, the date and fax stamp on the letter show that it was not received by Defendant until May 11, 2000.  (Doc. 41, Ex. C, Declaration of Shari Moler ¶¶ 3, 4)  In addition,  Moler has testified that she was unaware of Plaintiff's March OCRC charge at the time she ordered the second round of surveillance.

stated reason is mere pretext by demonstrating "(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate the discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original).

Plaintiff contends that her false testimony did not actually motivate her discharge.[11] Plaintiff provides a laundry list of reasons why Defendant's proffered reason is pretextual: (1) in late September, Mellott told Phil Ward, Plaintiff's union representative, that she would not be terminated for her workers' compensation testimony; (2) nothing occurred prior to August 8, 2000 that supported her termination; (3) in contradiction to Mellot's testimony, Tom Mobley testified that the decision to terminate her did not occur until after the OCRC mediation on October 5, 2000; (4) the purpose of the May surveillance was to set Plaintiff up for workers' compensation fraud and a subsequent termination; (5) Defendant waited until two months after Plaintiff's termination to request that criminal charges be instituted against Plaintiff for her false testimony; and (6) Plaintiff was not given the opportunity to explain her conduct on the surveillance tape because she thought the union would handle the situation.

The Court is not persuaded by Plaintiff's attempt to create factual issues with these arguments. The issue before the Court is whether Plaintiff's false testimony during a workers' compensation hearing actually motivated Defendant's decision to terminate her.

Regardless of Defendant's motivations in ordering the surveillance of Plaintiff, Plaintiff does not dispute that her testimony at the worker's compensation hearing on August 8, 2000 was false. Mellott has testified that soon after the hearing, there was a discussion regarding terminating Plaintiff, and that he informed Plaintiff's union on August 25, 2000 that Defendant planned to terminate Plaintiff. Defendant then launched an

---

[11] Plaintiff has not argued that the proffered reason has no basis in fact, *i.e.*, that she did not lie during the hearing, nor has Plaintiff argued that false testimony during a workers compensation hearing is insufficient to motivate her discharge.

internal investigation, which included meetings with Plaintiff on August 31 and September 13, 2000.

Plaintiff's only evidence that her termination was not based on her false testimony is the fact that she filed a charge with the OCRC on August 9, 2000. However, Mellott testified that the decision to terminate Plaintiff had been made in mid-August, and he didn't learn of the OCRC charge until August 31, 2000. The Court finds Defendant's version of events is supported by the highly detailed records compiled by Moler over the course of Plaintiff's employment. (See Moler Depo. Ex. 1) Moreover, the evidence demonstrates that Defendant was concerned about Plaintiff's possible misuse of leaves of absence and workers' compensation fraud months before Plaintiff engaged in protected activity by filing a discrimination claim with the OCRC.

Since Plaintiff has failed to come forward with evidence sufficient to prove that Defendant's reason for terminating her was a pretext, Defendant is entitled to summary judgment on Plaintiff's retaliation claim under O.R.C. § 4112.02(I).

### C. Public Policy Claim Based on Ohio Rev. Code § 4112.02(I).

Plaintiff claims that her termination violates Ohio's public policy against retaliation that is embodied in Ohio Rev. Code § 4112.02(I). Under Ohio law, termination of an at-will employee is wrongful if the termination was against a clear public policy. *Painter v. Graley*, 639 N.E.2d 51, 56 (Ohio 1994). In *Collins v. Rizkana*, the Ohio Supreme Court adopted the following analysis for determining whether the termination was against public policy:

> 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

15

652 N.E.2d 653, 657-58 (Ohio 1995).  However, this Court has recognized that Ohio courts have held that "[a] claim for wrongful discharge in violation of public policy embodied in [a] statute prohibiting discriminatory practices will fail if the underlying discrimination claim fails."  *Desanzo v. Titanium Metals Corp.*, 351 F. Supp. 2d 769, 782-783 (S.D. Ohio 2005) (holding that because plaintiff's disability discrimination claim failed, his public policy claim failed as a matter of law).

In addition, this Court, following the reasoning in *Wiles v. Medina Auto Parts*, 773 N.E.2d 526 (Ohio 2002), held that the public policy expressed by Ohio Revised Code § 4112.02(I) will not be jeopardized by the lack of a common law tort remedy.  *Id.*, at n.11.

Since Plaintiff's retaliation claim under Ohio Rev. Code § 4112.02(I) does not succeed, Defendant is entitled to summary judgment on the public policy claim as a matter of law.  Even if Plaintiff's retaliation claim were successful, under *Desanzo*, the jeopardy element of a successful public policy claim would not be met because adequate relief is provided by the statute.  Therefore, Defendant is entitled to summary judgment on Plaintiff's public policy claim based on Ohio Revised Code § 4112.02(I).

### D.    Public Policy Claim based on Workplace Safety.

Plaintiff also claims that her termination violated Ohio's public policy favoring workplace safety.  The Ohio Supreme Court has explained that:

> The public policy of this state demands that employees be provided with a safe work environment and that unsafe working conditions be corrected. This conclusion is supported by a host of statutes and constitutional provisions favoring safety in the workplace.

*Kulch v. Structural Fibers*, 677 N.E.2d 308, 322 (Ohio 1997) (holding that retaliation against employees who file OSHA complaints concerning unsafe or unhealthy conditions in the

workplace contravenes Ohio's public policy); *see also Pytlinski v. Brocar Prod., Inc.*, 760 N.E.2d 385, 388 (Ohio 2002).[12]

Plaintiff alleges that Defendant terminated her employment in retaliation for her repeated complaints about unsafe working conditions in its Trenton brewery. Plaintiff cites to complaints she made in 1995 and 1998. However, these complaints were made more than two years before Plaintiff was terminated.

Plaintiff also cites complaints that she made just a couple of weeks prior to her termination about spilled beer creating a "slippery and unsafe" work area in the dump room. The record indicates that Defendant's management responded positively to the complaints of Plaintiff and the other material services team members. Therefore, Defendant upheld Ohio's public policy that "unsafe working conditions be corrected." *Kulch*, 78 Ohio St. 3d at 152. Furthermore, Plaintiff was the only employee terminated, even though other team members complained about the condition of the dump room floor. In addition, Plaintiff has failed to provide any evidence that Mellott, the ultimate decision-maker, knew about the complaints when he decided to terminate Plaintiff. Consequently, Defendant is entitled to summary judgment on Plaintiff's claim based on Ohio's public policy favoring workplace safety.

### E. Violation of Family Medical Leave Act.

In her Complaint, Plaintiff alleges her termination by Defendant violated 29 U.S.C. §§ 2615(a), 2614(a)(2), and 2614. (Doc. 1 ¶¶ 43-44). Specifically, Plaintiff alleges that Defendant did not permit her to return to her position of employment, which "is a violation of 29 U.S.C. § 2615(a) which provides that it shall be unlawful for any employer to interfere

---

[12] One Ohio court has applied a burden-shifting analysis to a claim of retaliation based on complaints concerning workplace safety. *See McKinley v. Standby Screw Machine Products Co.*, 2002 WL 1348537, *5 (Ohio Ct. App. 2002). Even if this analysis is applicable, Plaintiff's claim would fail for the same reasons that her retaliation claim under Ohio Rev.Code § 4112.02(I) fails.

with, restrain or deny the exercise of or the attempt to exercise any right provided under this subchapter;" failed to restore her to the position of employment she held when her leave commenced or to an equivalent position; and caused a loss of employment benefits accrued prior to the date she took leave.  (Id.)

The Sixth Circuit recognizes "two distinct theories of recovery under the FMLA:  (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising under 29 U.S.C. § 2615(a)(2)."  *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2003).  Entitlement/interference claims are based on "prescriptive" rights, which establish "'entitlements' to employees and 'set floors for employer conduct,'" while retaliation claims are based on "proscriptive" rights, which "prohibit disparate employer conduct with regard to employees taking leave."  *Taylor v. The Union Institute*, 30 Fed. Appx. 443, 452 (6th Cir. 2002) (unpublished), *quoting*, *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998).  In addition, 29 U.S.C. § 2615(b)(1), makes it unlawful for an employer to discharge or discriminate against any individual who files a charge under or related to the statute.

The statute of limitations for these claims is two-years.  *See* 29 U.S.C. § 2617(c)(1) ("action may be brought under section 2615 not later than 2 years after the date of the last event constituting the alleged violation").  Plaintiff's Complaint was filed exactly two years from the date of Plaintiff's termination.  Therefore, if Plaintiff's FMLA claim is based on her entitlement to leave, this leave or request for leave would have necessarily taken place before her termination, and Plaintiff's claim would be barred by the statute of limitations.

By incorporating the language from the statute, Plaintiff's Complaint clearly refers to an entitlement claim under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  However, in her Memorandum in Opposition to Defendant's Motion, Plaintiff states that: "In this case, Sosby alleges that

18

Miller retaliated against her because she exercised her rights under the FMLA." (Doc. 38) Plaintiff explains that she filed her charge regarding FMLA leave in August and her FMLA rights were violated when she was terminated.

The Sixth Circuit has denied a plaintiff's attempt to inject a new claim at the summary judgment stage of litigation, even refusing to allow the plaintiff to amend a complaint under these circumstances. *Wade v. Knoxville Util. Bd.*, 259 F.3d 452 (6th Cir. 2001). In *Wade*, the court noted:

> To allow the amendments proposed by plaintiff would result in significant prejudice to the defendant. The dispositive motion deadline has already past, and defendant has filed a motion for summary judgment on all claims alleged in the original complaint. It is also apparent that significant discovery has been completed including more than 20 depositions. Obviously, some if not all of the depositions already taken would have to be supplemented to address the multiple issues raised in the proposed amendments and other extensive and additional discovery would have to be undertaken as well.

*Id.* at 459. However, even if the Court would permit Plaintiff to amend her Complaint at this point to add a retaliation claim, this claim would not survive summary judgment.

The Sixth Circuit has held that the *McDonnell-Douglas* burden-shifting framework should be applied to FMLA retaliation claims that are based upon indirect evidence. *Gibson v. City of Louisville*, 336 F.3d 511, 513 (6th Cir. 2003), *citing*, *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001). To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must establish: (1) that he or she engaged in a statutorily protected activity; (2) that the employer knew of his or her protected activity; (3) that he or she suffered an adverse employment action; and (3) that a causal connection existed between his protected activity and the adverse employment action. *Skrjanc*, 272 F.3d at 314. The employer then has the burden of articulating a legitimate nondiscriminatory reason for the adverse employment action. *Gibson*, 336 F.3d at 513. Finally, the plaintiff must show that this nondiscriminatory reason was in fact pretextual and that unlawful discrimination was the real reason for the adverse action. *Id.* However, temporal proximity is not, in and of itself, enough to prove pretext. *Skrjanc*, 272 F.3d at

317.  Furthermore, "[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."  *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002).

Here, Plaintiff's evidence that Defendant's nondiscriminatory reason for her termination is limited to the temporal proximity between her August 2000 FMLA complaint and her termination on October 9, 2000.  For the same reasons Plaintiff's retaliation claim under Ohio Revised Code § 4112.02(I) fail, Plaintiff's claim of retaliation under the FMLA fail also.  In addition, there is evidence that Defendant had concerns about the legitimacy of Plaintiff's injuries before she filed her FMLA charge.  Therefore, even if Plaintiff's complaint was properly filed as a FMLA retaliation claim, Defendant is entitled to summary judgment.

> **F.    : After-Acquired Evidence.**

After-acquired evidence of wrongdoing by an employee will preclude reinstatement and front pay if the conduct was such that it would have led the employer not to hire or to terminate the employee.  *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 361-62 (1995).  In addition, back pay should be limited (from the time of the wrongful discharge to the time that the wrongdoing is discovered), taking into account the fact that an employee's wrongdoing may be of such severity that the employee would have been rejected from consideration for employment on that basis alone.  *Id.* at 362.

Defendant argues that Plaintiff lied on her employment application, and it has not hired applicants in the past who have provided false information on their employment applications.  The Court finds that it is not necessary to reach this argument, given the disposition of Plaintiff's claims.

20

Based on the foregoing, Defendant's Motion for Summary Judgment (Doc. 31) is hereby **GRANTED**.  This matter shall be closed and stricken from the docket of this Court.

**IT IS SO ORDERED.**


                                                          /s/ Michael H. Watson
_____       Michael H. Watson, Judge
                                                      United States District Court